# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF VIRGINIA and the DISTRICT OF COLUMBIA *ex rel.* PRECHELLE SHANNON, | ) Case No. 22-CV-354 ) ) (Hon. Tanya S. Chutkan) ) ) |
| Plaintiffs/Relator, | ) **PLAINTIFF/RELATOR** ) **PRECHELLE SHANNON'S** ) **AMENDED COMPLAINT** |
| -v- | ) **AND JURY DEMAND** ) |
| BHG HOLDINGS, LLC d/b/a BEHAVIORAL HEALTH GROUP, BEHAVIORAL HEALTH GROUP, INC., and JOHN DOE ENTITIES 1-50. | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Plaintiff/Relator Prechelle Shannon ("Relator" or "Ms. Shannon"), by and through the undersigned counsel, and on behalf of the United States of American ("United States") and the State of Virginia and the District of Columbia (collectively, the "States"), hereby alleges as follows:

## I.    INTRODUCTION

1.    This is a *qui tam* action by Ms. Shannon against BHG Holdings, LLC d/b/a Behavioral Health Group, Behavioral Health Group Inc., and John Doe Entities 1-50 (together, "BHG") for using, making, presenting, and causing to make, use or present false claims to the governments of the United States and States (collectively, the "Government"), in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* and applicable state law.

2.    BHG is the parent company of the largest network of outpatient opioid treatment and recovery centers in the United States, with 115 clinics across 22 states, operating under various

subsidiary, related, or affiliate entities (John Doe Entities 1-50), including, but not limited to Behavioral Health Group, Inc. and VCPHCS L.P.  BHG has one clinic in Washington DC and eight clinics in Virginia.

3.     By way of background, and as part of its treatment program, BHG performs urine drug tests ("UDT") on its patients, which, when used appropriately, inform physicians of the amount of a particular substance (such as heroin or oxycodone) in a patient's system.  BHG has performed thousands of tests on its patients—approximately 80% of which are Medicare or Medicaid beneficiaries, including on patients in the DC and Virginia area from the BHG Washington DC clinic and the eight BHG Virginia clinics.

4.     By way of background, BHG performs substance abuse treatment counseling in the State of Virginia in its eight Virginia clinics.  BHG has performed substance abuse treatment services for thousands of patients in its Virginia clinics.

5.     The fraud alleged herein is straightforward.  Since 2016, BHG has used a variety of separate and independent schemes to illegally bill Medicare and Medicaid for medically unnecessary and unlawful tests and services.  BHG's unlawful practices include:

- From 2020 through 2021, and upon information and belief through the present, through its Washington DC clinic and its Virginia clinics:

    (a)     ordering unnecessary presumptive (screening) drug tests and definitive (confirmatory) drug tests for patients weekly; in many cases, ordering duplicative tests for patients more than two or three times per week;

    (b)     automatically ordering and conducting unnecessary presumptive and definitive UDTs for all patients with every visit, without any physician making an individual determination that either test was medically necessary for the particular patient for whom the tests were ordered;

    (c)     pressuring administrative and nursing staff to alter billing codes for increased patient drug testing, bypassing medical necessity protocols and failing to notify or obtain consent from the medical

director; and

    (d)    conducting unnecessary definitive drug tests, despite failing to first obtain presumptive urinalysis tests[1];

- From 2016 to present through its Virginia clinics:

    (a)    using unlicensed and uncertified counselors to perform treatment and illegally billing Medicare/Medicaid for their services at eight of its Virginia clinics;

    (b)    forcing staff to conduct unnecessary counseling sessions, and UDTs of all Medicare/Medicaid patients on a weekly basis, regardless of medical necessity; and

    (c)    forcing staff to enroll Medicaid patients in care coordinated services regardless of medical necessity at eight of its Virginia clinics.

6.    Medicare/Medicaid covers only those tests and services that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition, and performed by a licensed healthcare worker. *E.g.,* 42 U.S.C. § 1395y(a)(1)(A). The need for each test for each patient must be individually assessed. 42 C.F.R. §§ 410.32(a), (d)(2). With respect to UDTs, ordering definitive UDTs without first obtaining initial, presumptive screening, is medically appropriate only in limited circumstances, and is not medically necessary. In its DC clinic and its Virginia clinics, BHG subjected clients with

---

[1] The fraud schemes involving UDTs have been a recent focus for DOJ and have resulted in several large FCA settlements in the past year. *E.g.*, *Reference Laboratory, Pain Clinic, and Two Individuals Agree to Pay $41 Million to Resolve Allegations of Unnecessary Urine Drug Testing*, U.S. DEP'T OF JUSTICE, Office of Public Affairs (Apr. 15, 2020), *available at* https://www.justice.gov/opa/pr/reference-laboratory-pain-clinic-and-two-individuals-agree-pay-41-million-resolve-allegations (last visited Nov. 24, 2021); *Healthcare Company and Lab Pay $845K to Resolve Federal and State False Claims Act Allegations*, U.S. Attorney's Office, District of Connecticut (Feb. 5, 2021), *available at* https://www.justice.gov/usao-ct/pr/healthcare-company-and-lab-pay-845k-resolve-federal-and-state-false-claims-act (Nov. 24, 2021); *Nevada Medical Practice Agrees to Pay $1 Million to Resolve Allegations for False Medicare Reimbursement Claims: Medical Practice Billed Medicare for Expensive Drug Testing It Did Not Use*, U.S. DEP'T OF JUSTICE, U.S. Attorney's Office, District of Massachusetts (Aug. 19, 2021), *available at* https://www.justice.gov/usao-ma/pr/nevada-medical-practice-agrees-pay-1-million-resolve-allegations-false-medicare (last visited Nov. 24, 2021).

consistently negative urine drug test results for substances other than those prescribed medication, including methadone, to ongoing medically unnecessary UDTs. Despite documentation and reporting of these negative results by Ms. Shannon to her supervisor, the practice persisted.

7.    Medicare/Medicaid and Virginia requires that substance abuse treatment services are to be provided by licensed counselors and only reimburses for services provided by licensed counselors.  In its Virginia clinics, BHG used unlicensed counselors for substance abuse treatment services.  Despite concerns raised by Ms. Shannon, the practice persisted.

8.    BHG knowingly and purposefully implemented the fraudulent practices alleged herein, designed to target, induce, and exploit vulnerable Medicare/Medicaid beneficiaries all to illegally increase payment from the Government.  The fraud has been going on for years and is continuing.

9.    Ms. Shannon discovered both fraudulent schemes after she was hired in November 2020 as the Program Director and Regional Clinical Director at two BHG clinics in Washington D.C. and Virginia.  Shortly after beginning her employment, Ms. Shannon recognized the conduct as fraudulent and illegal, and took action to halt the ongoing practice.  She reported her concerns to her immediate supervisors and others at BHG, providing them with relevant resources.  These included providing them with Virginia's Chapter 35, articles for substance abuse counselors (§ 54.1-3507.1), and Guidance document 115-11 from the Board of Counseling. These documents outline the scopes of practice for those regulated by the Board and the specific treatment roles and responsibilities associated with each license and certification level.

10.    Despite Ms. Shannon's efforts to raise these concerns internally, BHG ignored her and continued the practices, prompting Ms. Shannon to report the fraud to the Government.

11.    The damages incurred by the Government as a result of the foregoing fraud are

substantial and are continuing today.  With respect to only the medically unnecessary UDTs (and setting aside the fraud relating to unlicensed counselors and unnecessary weekly counseling sessions), on information and belief, BHG's DC/Virginia clinics submitted 400-800 medically unnecessary UDTs per month.  Ms. Shannon estimates that BHG receives approximately $60-70 from Medicare/Medicaid per UDT (but depending on the code used, the reimbursement rate varies from $12.60 per test (for routine presumptive testing) to $246.92 per test (for more complicated definitive testing)).  Ms. Shannon estimates that BHG receives between $104-394 for various substance abuse treatment services.  With respect to unlicensed counselors, BHG's Virginia clinic submitted hundreds of false claims per month.  In addition, each claim for a medically unnecessary UDT and each claim for a substance abuse treatment service provided by an unlicensed counselor is also a false claim for statutory penalty purposes.

12.    The Government has declined to intervene at this time but may elect to intervene in the future.

## II.    NATURE OF THE ACTION

13.    This is an action to recover treble damages and civil penalties arising from the fraudulent conduct of BHG for using, making, presenting, and causing to make, use, or present false statements and claims to the Government in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. and applicable state law.

14.    Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery.  31 U.S.C. § 3730(b).  That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.  The relevant state law FCA equivalents are to similar effect.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331, 1345.

16.    This Court has personal jurisdiction over BHG pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. The fraud alleged herein is occurring nationwide and, on information and belief, BHG has billed the Government for unnecessary UDTs for residents of New Jersey.

17.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because some of the acts and transactions upon which the claims asserted here involved residents of New Jersey.

18.    This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

## IV.    THE PARTIES

19.    Ms. Shannon brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs, such as Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA") and all other government programs.

20.    Ms. Shannon also brings this action on behalf of the State of Virginia and the District of Columbia, including all state counterpart agencies to the federal agencies referenced above.

21.    Ms. Shannon also brings this action on her own behalf, as permitted under the False Claims Act. Ms. Shannon is a resident of Washington D.C. and discovered BHG's fraudulent

scheme in her role as a Program Director and Regional Clinical Director at BHG's facilities in Washington D.C. and Virginia. Ms. Shannon has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based, is the original source of these allegations, and has knowledge of the false claims and records that BHG knowingly, falsely, and fraudulently submitted to the Government as alleged herein.

22.    Defendant BHG Holdings, LLC is a Texas limited liability company with its principal place of business at 5001 Spring Valley Road, Suite 600 East, Dallas, Texas 75244. Upon information and belief, BHG Holdings, LLC is a holding company for a network of 115 different opioid treatment and recovery facilities in 22 different states, operating under various subsidiary, related, or affiliate entities (John Doe Entities 1-50), including, but not limited to Behavioral Health Group, Inc and VCPHCS L.P. BHG has a DC location and eight clinics in Virginia.

## V.    LEGAL FRAMEWORK

### A.    The False Claims Act

23.    The False Claims Act imposes civil liability upon any person who:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] . . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a). The Affordable Care Act requires a person who has received an overpayment from the Government to report and return the overpayment within 60 days of identification, or the

date that any corresponding cost report is due; and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

24.    For purposes of the FCA:

(1)    the terms "knowing" and "knowingly"

(A)    mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B)    require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

25.    Effective November 2, 2011 (the date of enactment of the Federal Civil Penalties Inflation Adjustment Act, Improvements Act of 2011, Public Law 114-74, sec. 701 ("2011 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of $5,500 and $11,000 to $10,781 and $21,563. The increased amounts apply to civil penalties assessed for violations occurring after November 2, 2011. Violations that occurred on or before November 2, 2011 are subject to the previous penalty amounts. On February 3, 2016, pursuant to the 2011 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to a minimum-maximum per-claim penalty of $10,957 and $21,916. On January 19, 2018, the FCA penalties were again increased to a minimum-maximum per-claim penalty of $11,181 and $22,363. In February 2019, the amounts were increased again to $11,463 and $22,927. 84 Fed. Reg. 2445, 2446 (Feb. 7, 2019). In 2020, these amounts were again increased to $11,665 and $23,331. 15 C.F.R. § 6.3 (2020); 85 Fed. Reg. 207, 208 (Jan. 3, 2020). In 2021, these amounts were again increased to the current amounts of $11,803 and $ 23,607. 86 Fed. Reg. 2005 (Jan. 6, 2021). In 2022 these amounts were again increased to the amounts of $12,537 and

$25,076. 81 Fed. Reg. 2187 (Jan. 13, 2022).  In 2023, these amounts were again increased to the current amounts of $13,508 and $27,018 per claim.  88 Fed. Reg. 5776 (Jan. 30, 2023).

**B.** **Medicare Reimbursement for "Reasonable and Necessary" Services**

26.     Congress established the Medicare program, or Title XVII of the Social Security Act, in 1965 with the goal of providing nationalized health coverage for Americans aged 65 or older, and the disabled.  In 2011, Medicare covered over 55 million Americans.  Medicare is funded through the Medicare Trust Fund, which relies on workers' payroll deductions and government funds.

27.     The United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

28.     Part A of the Medicare Act, 42 U.S.C. § 1395c, *et seq.*, provides insurance for costs of inpatient hospital services and certain other services.  Part A is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible. Part A generally pays 100% of the cost of covered services after deductibles and co-insurance, up to Medicare coverage limits.

29.     Part B of the Medicare Act, 42 U.S.C. § 1395j, *et seq.*, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically-necessary outpatient services, such as doctors' office visits and home health care. Generally, Part B covers 80% of the cost of such services after exhaustion of deductibles.

30.     Section 1862 of the Social Security Act, codified at 42 U.S.C. § 1395y(a)(1)(A), explains that under Medicare Part B, "no payment may be made under part A or part B for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the prevention of illness."

31.    Decisions about what services, procedures, or tests are reimbursed, or "covered," by Medicare, is made either locally or at the national level.  A national coverage determination is binding on all Medicare Administrative Contractors ("MAC") and Medicare carriers.  In the absence of a national coverage determination being made, local determinations fill the gap.  The vast majority of coverage determinations happen at the local level, and are typically made by fiscal intermediaries, MACs, or durable medical equipment regional carriers.

32.    Medical services, including laboratory tests that have not been established as safe and effective or have no proven clinical utility are not "reasonable and necessary."  54 Fed. Reg. 4302-4318.  Health services—including laboratory tests that do not meet this standard—are considered investigational and are not covered by Medicare.

33.    To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance.  42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1).  Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

34.    By participating in the Medicare program, BHG is charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicare program, and has consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

### C.    Billing Medicare for Testing Services

35.    Laboratory services, like UDT, must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

36.    Medicare Part B pays for covered diagnostic laboratory tests that are furnished by

a laboratory.  42 C.F.R. § 410.32(d)(v).  "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition."[2]

37.    To receive Medicare reimbursement, "diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary," 42 C.F.R. § 410.32(a), and the physician or other Medicare-qualified clinical personnel must certify that the test is medically necessary and reasonable for the diagnosis and treatment of the patient, 42 U.S.C. § 1395n(a)(2)(B); 42 C.F.R. § 424.10(a).

38.    To comply with the requirements of 42 C.F.R. § 410.32(a), that a treating physician order and then use the lab results, Medicare requires that laboratories keep and maintain documentation from the ordering physician.  This documentation must indicate that the treatment was necessary and reasonable to the patient's particular diagnosis or medical issue, and that the claim submitted to Medicare accurately reflects the information received from the ordering physician.  42 C.F.R. § 410.32(d)(2)(ii).

39.    Medicare typically pays for laboratory testing claims on a fee-for-service basis. Payment for outpatient lab tests is generally based on the Clinical Laboratory Fee Schedule set out in 42 U.S.C. § 1385l(h)(1)(A).  Laboratories are reimbursed either the lesser of their actual charges, the local fee for that geographic area, or a national limit which is a percent of the median of all local schedule amounts of each test.

40.    When a laboratory provider performs a test, the provider identifies the Current Procedural Terminology ("CPT") code that correlates to the test being conducted and submits this code to the MAC for reimbursement.  Depending on the code used, the reimbursement rate varies

---

[2] Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1.

from $12.60 per test (for routine presumptive testing) to $246.92 per test (for more complicated definitive testing).[3]

### D.  **The Medicaid Program**

41.    Medicaid is a public-assistance program that provides payment of medical expenses for low-income and disabled patients.  Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act, the Medicaid Act, and with the regulations the Secretary of HHS promulgates.  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines which restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

42.    Like Medicare, Medicaid covers laboratory testing only if it is reasonable and necessary to diagnose or treat a patient's particular medical condition.  Although Medicaid reimbursement for laboratory testing varies depending on the state in which the billing is done, all services provided must meet the medical necessity threshold.

43.    By participating in a state's Medicaid program, BHG is charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and has consented to compliance with all such statutes, regulations, and rules.

### E.  **Urine Testing and the Clinical Laboratory Business**

44.    Urinary drug testing is a common laboratory test conducted to determine whether a patient is taking drugs that might interfere with planned medical treatment, or to ensure that a

---

[3] *See, e.g.,* Clinical Laboratory Fee Schedule, Centers for Medicare & Medicaid Services, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/ClinicalLabFeeSched/Clinical-Laboratory-Fee-Schedule-Files (last visited Nov. 22, 2021).

patient in a recovery program is not abusing prescription or illicit drugs.  UDTs are frequently administered in connection with patients undergoing treatment for substance use disorder.  UDT is recognized as an appropriate medical treatment and is often reimbursed by public and private insurers for this purpose.

45.    Because much of the cost associated with UDT comes from the capital investment necessary for sophisticated equipment necessary to conduct the tests, the marginal cost of performing individual tests is relatively low.  Thus, the more UDTs BHG performs, the more money it makes.

46.    Clinical urine testing is done in two stages.  First, the healthcare provider screens for any number of different drugs, typically 11 or 12, known as "presumptive testing."  An 11 panel screening test, or "screen," tests for the presence of cocaine, opiates, amphetamines, methamphetamine, phencyclidine (PCP), MDMA (the active ingredient in Ecstasy), barbiturates, benzodiazepines, methadone, tricyclic antidepressants and oxycodone.  A 12 panel screen adds a test for THC, the active ingredient in marijuana.  A screen only determines the presence of the various drugs in the urine; it cannot measure the concentration.  But the second stage—"definitive testing"—does.

47.    There are two methods of performing screens.  The first is an immunoassay, a well-known test that rapidly determines the presence or absence of the tested drugs.  Most laboratories are capable of processing this type of test and results are quickly generated.

48.    The second method is when a drug screen is performed in doctors' offices and clinics (known as "Points of Care" or "POCs") with a relatively inexpensive cup to collect urine. These cups come with an array of strips—typically a panel of 11 or 12 treated strips—one for each drug being tested.  The strips are dipped into the urine specimen by a medical assistant, and a

change in color of the strip will illustrate the presence or absence of the specific drug for which each strip tests. Using POCs, a physician can receive almost immediate results for the substances tested.

49.     Due to the possibility of false positives and the fact that screens do not provide information about the quantity of drug detected, when a screen returns a positive result, the standard of care is to perform confirmatory testing for the specific drugs that yield a positive result in the screen. *See e.g.,* 73 Fed. Reg. 71858, 71878 at Sec. 1.5 (Nov. 25, 2008) (providing that further testing is not required if there is a negative result.)

50.     Confirmatory testing is conducted in laboratories that can perform mass spectrometry and either gas or liquid chromatography. In contrast to immunoassay analysis or POC screening, confirmatory testing for several drugs must be run separately on each drug and the results will provide the quantity of the drug found in the urine specimen. False positive or negative results from confirmatory testing are very rare.

51.     The two-step process for drug testing is recognized as the most cost efficient method of drug detection. Costs relating to drug screening are quite low—Medicare reimbursement for presumptive tests range from $12.60 per test (CPT 80305) to $62.14 (CPT 80307).

52.     Confirmatory testing of individual drugs is more expensive. Medicare reimburses between $114.43 (CPT G0480) and $246.92 (CPT G0481) for each of test. Thus, a full set of tests on each patient can cost over $300.

53.     The vast majority of patients do not test positive for any of the drugs; in a healthy population base, only 3 to 5% of all screens return any positive results. By performing confirmatory testing only on those patients who return a positive screen, and then only testing for

the drugs that come back positive, the Government can ensure drug testing is performed in a cost-effective manner. To run confirmatory drug tests for all or most patients is medically unnecessary, fraudulent, and not economical.[4]

### F.    Federal Reimbursement for Urine Drug Testing

54.    Medicare, and individual states through Medicaid, reimburse a large percentage of all UDTs conducted in the United States. Individuals with substance use disorders receive UDTs on a regular basis, and many of these patients' testing is covered by Medicare. BHG performs UDTs for Medicare and receives payment for such services directly from the United States.

55.    Medicaid, whose population also includes beneficiaries with past or present drug abuse, also routinely pays for UDTs.

56.    Given the large number of UDTs paid for by state and federal governments, federal and state authorities have recognized the potential for abusive billing of the tests and have taken steps to limit the number and types of tests eligible for reimbursement.

57.    The Office of the Inspector General ("OIG") has set guidelines for curbing abusive urine testing. In August 1998, OIG issued a Compliance Program Guidance for Clinical Laboratories (the "Guidance"). 63 FR 45076. Although the Guidance does not have the force of a duly promulgated regulation, it sets forth OIG's (and Medicare's) understanding of how clinical laboratories should conduct their business in order to avoid running afoul of the Medicare/Medicaid fraud and abuse rules.

58.    The Guidance emphasizes that claims submitted for services will only be paid if

---

[4] *See e.g.,* REIMBURSEMENT POLICY STATEMENT OHIO MEDICAID JANUARY 1, 2021- JUNE 30, 2021, Section D (VII), accessible at: https://www.caresource.com/documents/medicaid-oh-policy-reimburse-py-0020-20210101/ (last visited Nov. 22, 2021). *See also,* 42 U.S.C. § 1320c-5(a) (requiring services to be "economical…and medically necessary").

the service is covered, and is reasonable and necessary for the beneficiary given his or her clinical condition.  The Guidance warns that Medicare will not pay for testing where "documentation in the entire patient record . . . does not support that the tests were reasonable and necessary for a given patient." *Id.* at 45079.

59.     The Guidance explicitly discourages standing orders, which "too often have led to abusive practices." "Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary.   As a result of the potential problems standing orders may cause, the use of standing orders is discouraged." *Id.* at 45077.  When standing orders are in place, testing facilities have a duty to monitor them to ensure that tests are reasonable and necessary.

60.     More recently, the OIG issued a report where it recognized that there is rampant abuse of Government-reimbursed drug testing and recommended substantial changes to curb abuse, like the type identified here.  The report issued the findings of an audit where the OIG concluded the improper payment rate for drug testing services was 58.9% for the drug test with the highest Medicare fee schedule amount.[5]

G.     **Virginia Law Regarding Substance Abuse Treatment Services**

61.     Virginia rules to use licensed counselors for substance abuse treatment services. Va. Code § 54-1-3506 ("In order to engage in the practice of counseling or marriage and family therapy or in the independent practice of substance abuse treatment, as defined in this chapter, it shall be necessary to hold a license issued by the Board [of Counseling.")

---

[5] *See* OPPORTUNITIES EXIST FOR CMS AND ITS MEDICARE CONTRACTORS TO STRENGTHEN PROGRAM SAFEGUARDS TO PREVENT AND DETECT IMPROPER PAYMENTS FOR DRUG TESTING SERVICES, Department of Health and Human
Services, Office of Inspector General, June 2021, available at: https://oig.hhs.gov/oas/reports/region9/92003017.pdf.

## VI.    **FACTUAL ALLEGATIONS**

62.    BHG is the parent company for the largest network of outpatient opioid treatment and recovery centers in the United States, with 115 clinics across 22 states.  BHG has one clinic in Washington DC and eight clinics in Virginia.

63.    Since 2016, BHG used a variety of separate and independent schemes to illegally bill Medicare and Medicaid for medically unnecessary and unlawful tests and services.  BHG's unlawful practices include:

- From 2020 through 2021, and upon information and belief through the present, through its Washington DC clinic and its Virginia clinics:

  (a)    ordering unnecessary presumptive (screening) drug tests and definitive (confirmatory) drug tests for patients weekly; in many cases, ordering duplicative tests for patients more than two or three times per week;

  (b)    automatically ordering and conducting unnecessary presumptive and definitive UDTs for all patients with every visit, without any physician making an individual determination that either test was medically necessary for the particular patient for whom the tests were ordered;

  (c)    pressuring administrative and nursing staff to alter billing codes for increased patient drug testing, bypassing medical necessity protocols and failing to notify or obtain consent from the medical director; and

  (d)    conducting unnecessary definitive drug tests, despite failing to first obtain presumptive urinalysis tests;

- From 2016 to present through its Virginia clinics:

  (a)    using unlicensed and uncertified counselors to perform treatment and illegally billing Medicare/Medicaid for their services at eight of its Virginia clinics;

  (b)    forcing staff to conduct unnecessary counseling sessions, and UDTs of all Medicare/Medicaid patients on a weekly basis, regardless of medical necessity; and

  (c)    forcing staff to enroll Medicaid patients in care coordinated

services regardless of medical necessity at eight of its Virginia clinics.

64.     Ms. Shannon discovered the fraud after she was hired in November 2020 as the Program Director and Regional Clinical Director at two BHG clinics in Washington D.C. and Virginia.  Shortly after beginning her employment, Ms. Shannon recognized the conduct as fraudulent and illegal, and took steps to halt the ongoing practices, including raising concerns to her immediate supervisors and others at BHG.  Despite Ms. Shannon's efforts to raise these concerns internally, BHG ignored her and continued the practices regardless, prompting Ms. Shannon to report the fraud to the Government.

## A.    Ordering Unnecessary Tests

65.     Medicare/Medicaid covers only those tests and services that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition, and performed by a licensed healthcare worker. *E.g.,* 42 U.S.C. § 1395y(a)(1)(A).  The need for each test for each patient must be individually assessed.  42 C.F.R. §§ 410.32(a), (d)(2).  With respect to UDTs, ordering definitive UDTs without first obtaining initial, presumptive screening, is medically appropriate only in limited circumstances, and is not medically necessary.  In the Washington, DC location, BHG subjected clients with consistently negative urine drug test results for substances other than those prescribed medication, including methadone, to ongoing medically unnecessary UDTs.  Despite documentation and reporting of these negative results by Ms. Shannon to her supervisor, the practice persisted.  In addition, billing for services performed by unlicensed counselors is unlawful and constitutes a false claim.

66.     From 2020 through 2021, and upon information and belief through the present BHG's DC clinic and Virginia clinics knowingly and purposefully implemented the fraudulent practices alleged herein, designed to target, induce, and exploit vulnerable Medicare/Medicaid

beneficiaries all to illegally increase payment from the Government.

67.    With regarding to fraudulent UDT testing, BHG implemented a practice of designating certain patients as "Code 1" and issuing standing orders which indicated the patient should be subjected to weekly UDTs without regard to medical necessity.  Code 1 patients would often receive duplicative tests as often as three, four or five times per week.

68.    Once subjected to the initial testing, BHG then used standing orders and incentive structures for BHG staff to promote the overuse of confirmatory drug tests regardless of the results of the initial screen or other clinically relevant facts.

69.    In other cases, Code 1 patients—as well as others—simply skipped the initial preliminary screen altogether and instead were ordered to take medically unnecessary definitive drug tests, which would be reimbursed at a substantially higher rate by the Government.

70.    From 2020 through 2021, and upon information and belief through the present, BHG's DC location and Virginia locations had a policy or ordering unnecessary tests that were not reasonable or necessary for the treatment or diagnosis of an individual patient's illness or injury and were not based on medical condition.

71.    The problems were acute and exemplified in a May 21, 2021 email between Nnemdi Elias, Medical Director for BHG-DC and Ahmond Hill, Regional Director for BHG Washington DC/VA:

> Good morning, Mr. Hill.
>
> I trust this email finds you well.
>
> I am just following up on an issue of concern of which the medical team was just made aware of yesterday.
>
> Nurse Hannah was informed yesterday by Fatima that you had instructed her to change the laboratory orders, i.e., changing urine tests to weekly tests for several patient groups.

My concerns with this are two-fold. Laboratory Orders are under the purview of the medical director, and the medical director's name is on the results and the external lab orders. Secondly, weekly testing for all patient groups is not medically justifiable. Even internal BG policy recommends a minimum of once a month/12 per year unless in the early treatment period. External ASAM recommendations are similar.

**I have opened and operated businesses, (even pursued an MBA) and fully understand that need for revenue generation. However, patient-related discussions must be ethically and medically sound and clinically justifiable.** In addition, decisions regarding patient orders – dosing, medication, take homes and laboratory – are for the medical directors to make, as s/he is liable and at a minimum, should involve the nursing team.

May 21, 2021 email chain (Ex. A) (emphasis added).

72.    Ms. Shannon was aware of this problem. Ms. Shannon spoke directly to Ahmond Hill about improper practice and its risks for the clinic, but her concerns were ignored. To address the issue, she consulted with the nursing staff to implement a strategy to halt the arbitrary weekly testing until patients could be properly evaluated, thereby reducing the clinic's risks. However, when Ahmond Hill became aware of the reduction in weekly testing, he instructed his office manager, Fatima Ours, who had administrative rights in the patient management system, to not only restore his original practice but also increase the weekly testing for even more patients.

73.    BHG, in the DC clinic and at its Virginia clinics, pressured administrative and nursing staff to alter billing codes for increased patient drug testing.

74.    BHG, in the DC clinic and at its Virginia clinics, bypassed medical necessity protocols and medical director approval.

75.    BHG had actual knowledge of this conduct in the DC clinic and at its Virginia clinics but chose not to correct it. Alternatively, BHG recklessly disregarded this conduct or was deliberately ignorant of the conduct.

76.     As a result of this conduct in the DC clinic and at its Virginia clinics, BHG submitted thousands of false claims for medically unnecessary presumptive (screening) drug tests and definitive (confirmatory) drug tests for thousands of patients.

**B.      Unlicensed Counselors in Virginia**

77.     In addition to the fraudulent UDT scheme describe above, since 2016, BHG's Virginia clinics adopted a practice of using unlicensed addiction counselors to perform drug treatment services and illegally billing Medicare/Medicaid for their services at eight of its Virginia clinics, and forcing staff to conduct unnecessary weekly counseling sessions of all Medicare/Medicaid patients on a weekly basis, regardless of medical necessity.   This also included pressuring staff to enroll Virginia Medicaid clients in care coordinated services regardless of medical necessity.   BHG threatened staff with violations of  Medicaid care requirements, claiming they weren't meeting Medicaid standards if they failed to enroll all Medicaid clients in care coordination.   BHG leadership directed clinical management to discipline counselors who failed to enroll clients in these services regardless of medical necessity.

78.     BHG was required under Virginia rules to use licensed counselors for substance abuse treatment services.  Va. Code § 54-1-3506.

79.     Licensure was a requirement and condition for reimbursement for substance abuse treatment in Virginia.

80.     From 2016 to 2021, and upon information and belief, continuing to the present, BHG did not use licensed counselors for substance abuse treatment services for thousands of patients in its Virginia clinics.

81.     BHG internally knew that it had a problem with unlicensed counselors in Virginia. Ms. Shannon personally reported the problem within BHG.  Ms. Shannon reported her concerns

to her immediate supervisors, Shari Garceau and Tina Beckley, and others at BHG, including but not limited to Amamda Karistai, Thomas Whinnett, Tammy Kinlaw, Patick Nicholas, Tequia Young. On August 3, 2024, Ms. Shannon contacted the Virginia Board of Counseling directly and received a response on August 5, 2024. The board informed her of the prohibition against unlicensed and uncertified counselors. She shared this information with her immediate supervisors. Ms. Shannon provided them a copy of Virginia's Code (identified above), and Guidance Document 115-11 from the Virginia Board of Counseling (Ex. A) which clarifies what substance abuse treatment services require appropriate licensure. Ms. Shannon also urged BHG leadership to contact the board, but they declined to do so and continued with their scheme.

82.    In a July 15, 2021 internal email to Ms. Shannon and others, Patrick Nicholas, a Clinical Supervisor at BHG admitted to the licensure problem.

> **Team,**
>
> **We had a brief meeting to assess where our uncredentialed counselors are in the process of CSAC credentialling. Using the guidance Ahmond provided last week we assessed where each counselor is in the application process.**

July 15, 2021 BHG email chain (Ex. B) (emphasis added).  The email identifies numerous counselors who were providing substance abuse treatment services to patients in Virginia when they were not appropriately licensed, and outlines their efforts to obtain appropriate licenses.

83.    Ms. Shannon forwarded the email to Tina Beckley, Director of Counseling Services at BHG, who replied:

> Thanks.  I also received that from Amanda.  **Still some concerns about who can do what so we will be discussing.**  I appreciate you looping me in though!

July 15, 2021 BHG email chain (part of Ex. B) (emphasis added).

84.    Ms. Beckley was also working on the unlicensed counselor issue in Virginia.  On

July 6, 2021, Ms. Beckley wrote an email regarding the unlicensed counseling issue, copying Ms.

Shannon:

> Hi all,
>
> The counselor supervisor in Glen Allen asked me about VA counselor credential requirements this morning. He reported that two of the counselors are certified and that five of them appear to be non-credentialed. Of the five, two had been under LPC but let that lapse. **The VA certification limits what counselors can do that are not able to provide substance abuse treatment independently.**
>
> **I checked with Cheryl Wilde who confirmed that counselors are not credentialed. In Glenn Allen we have 442 Medicaid patients so this is a significant concern from a state and payer perspective as there specific scopes of practice from the VA Board of Counseling.**

July 6, 2021 email chain (Ex. C) (emphasis added). Amanda Karistai, BHG's Regional Vice

President of Operations replied to Ms. Beckley and indicated that this was "[e]xtremely

concerning." Cheryl Wilde, BHG's Credentialing Specialist later replied:

> **The fact we do not credential counselors internally first has been concerning me since I began at BHG but do understand the reasoning behind why we have not in the past. However, recently there has been some issues identified where counselors were not credentialed with payers (MCO's, Medicaid, and Medicare) so I have spoke to Zack at Catalyst and working through a plan to determine what counselors need credentialed at the payer level and secondly, how we can prevent this going forward internally.**

July 6, 2021 Email (part of Ex. C) (emphasis added).

85. Unlicensed counselors was a problem because BHG did not have enough

counselors to provide substance abuse treatment services in Virginia for its patients, much less

appropriately licensed counselors. At the same time, BHG was pressuring its Virginia counselors

to increase their patient workload, and paying bonuses to counselors to increase their patient

workload, to take advantage of the fact that Virginia reimburses for substance abuse treatment services.  For example, in August of 2021, Amanda Karistai, BHG Regional Vice President overseeing the Virginia region, wrote:

> Substance Use Care Coordination is a huge benefit to our patients in Virginia.  We don't have this option for our patients everywhere so I'm really eager to take advantage of this for our patients in need in Virginia.  **My goal is that every single patient with this benefit through Medicaid is enrolled in SUCC.**  If a patient has Medicaid, it's likely that there is some need for referrals and wraparound care.  Since our patients need it and we have the capability to provide it, I continue to be confused as to why we aren't enrolling every patient that we can.  From a clinical perspective, it's the right thing to do.
>
> **I'd like to know how we get back to the place where every patient using Medicaid is receiving this service.  It used to be the norm in Glenn Allen, and we've gotten woefully away from this standard.**

August 20, 2021 email chain (Ex. D) (emphasis added).

86.     The pressure to provide counseling services without appropriately licensed counselors continued throughout 2021.  For example, in October of 2021, Tammy Kinlaw, Program Director at BHG's Glenn Allen facility in Virginia wrote:

> Good evening Team,
>
> I hope you all had a great weekend!
>
> Please find below the patient engagement totals for last week.  The minimum expectation is that half of the hours you work are spent with Patient Engagement.  If you work 40 hours a week you should be having 20 hours of counseling sessions for our clients.  As you can see below no one met the minimum requirements for patient engagement last week.  We also have a total of 32 Medicare Clients that are required to have individual sessions weekly per Medicare Requirements.  Of those 32 clients 10 of them did not have a session last week.  You should all be scheduling your Medicare clients in the beginning of the week so that if you haven't spoken to them by Wednesday or so you should be placing a hold on them to not dose until they have that session.  As of 10/23/2021 only 66 clients out of 308 have been presented for Care Coordination this month.

> **Medicaid requires at least 75% of all Medicaid clients be enrolled in care coordination. Enrolling and presenting clients in Care Coordination is mandatory. Team this is not the first time I have informed you all of the Medicare and Medicaid Requirements. Patrick has completed training with all of you as to how SUCC should be completed and what is needed. Beginning this coming week each of you MUST present at least 15 clients per week for Care Coordination. These patient engagement numbers are not acceptable and neither are the number of clients that have been presented for care coordination so far this month. We have one more week in this month. It is imperative that each of you present at least 15 clients this week for care coordination this coming Thursday.** Ensure you are emailing Patrick and myself each Wednesday the list of clients you are presenting for care coordination. Let's all work together to ensure all of our clients are getting the services they do desperately need.

October 24, 2021 email chain (Ex. E) (emphasis added).

87.     BHG worked to solve the unlicensed counsel problem in 2021, but they never hired enough licensed counselors to provides substance abuse treatment services in 2021 or at any point thereafter. BHG never employed enough licensed counselors during the relevant time period to provide substance abuse treatment services. Hiring more counselors and/or encouraging counselors to obtain appropriate licenses in 2021 also did not solve the problem with claims that BHG submitted in Virginia for thousands of patients treated at its Virginia clinics. As a result, BHG submitted thousands of claims for reimbursement for thousands of patients that included claims for substance abuse treatment services that were improperly provided by unlicensed counselors. The claims can be identified by reviewing the BHG records of which unlicensed counselor provided substance abuse treatment services for patient claims.

88.     Each claim submitted for reimbursement in Virginia for reimbursement that included substance abuse treatment services that were provided by unlicensed counselors is a false claim. BHG certified that its claims for reimbursement complied with Virginia rules and

regulations, but they did not.

89.    BHG knew that its claims did not qualify for reimbursement at the time the claims were submitted.  BHG knew, or acted with reckless disregard and/or deliberate ignorance, in submitting false claims for reimbursement.

90.    In the past, BHG has attempted to justify its conduct by arguing that the unlicensed supervisors were "supervised" by licensed counselors, but this argument is false and inaccurate. There was no active supervision of unlicensed counselors during the relevant timeframe; there were not enough licensed counselors to supervised unlicensed counselors at the multiple Virginia clinics.  BHG attempted to have Patrick Nichols, a BHG Clinical Supervisor, provide supervision, but Mr. Nichols was not a Licensed Mental Health Professional qualified to provide Supervision under the Virginia regulations.  BHG attempted to have an outside third party provide supervision, but the third party could not provide supervision to all unlicensed counselors in Virginia.  BHG did not and could not provide "supervision" to all unlicensed counselors providing substance abuse treatment in Virginia during the relevant time period.

91.    BHG had actual knowledge of this conduct at its Virginia clinics but chose not to correct it.    Alternatively, BHG recklessly disregarded this conduct or was deliberately ignorant of the conduct.

92.    As a result of this conduct in the DC clinic and at its Virginia clinics, BHG submitted thousands of fraudulent claims for substance abuse treatment services for thousands of patients that BHG knew were false and fraudulent because the services were performed by unlicensed counselors.

* * *

93.    The damages incurred by the Government as a result of the foregoing fraud are

substantial and are continuing today.  With respect to only the medically unnecessary UDTs (and setting aside the fraud relating to unlicensed counselors and unnecessary weekly counseling sessions), and unnecessary care coordination services, on information and belief, each of BHG's 115 clinics perform between 400-800 UDTs per month.  Ms. Shannon estimates that BHG receives approximately $60-70 from Medicare/Medicaid per UDT (but depending on the code used, the reimbursement rate varies from $12.60 per test (for routine presumptive testing) to $246.92 per test (for more complicated definitive testing)).  Based on these figures, and upon information and belief, BHG has wrongfully billed Medicare/Medicaid in excess of ten million dollars in the past 12 months alone.  Ms. Shannon estimates that BHG receives between $104-394 for various substance abuse treatment services.  With respect to unlicensed counselors, BHG's Virginia office submitted hundreds of false claims per month.  In addition, each claim for a medically unnecessary UDT and each claim for a substance abuse treatment service provided by an unlicensed counselor is also a false claim for statutory penalty purposes.

94.    The fraud was material to payment by the Government.  Had the Government known that the services billed were medically unnecessary or being performed by an unlicensed counselor, it would not have paid BHG for UDTs or for the substance abuse treatment services.

## COUNT ONE
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

95.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

96.    As set forth above, since at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).  BHG knowingly and falsely

certified that its claims for reimbursement complied with all applicable laws and regulations.

97.    By virtue of the false or fraudulent claims submitted or caused to be submitted by BHG, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### COUNT TWO
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

98.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

99.    As set forth above, since at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly and falsely certified that its claims for reimbursement complied with all applicable laws and regulations.

100.    By virtue of the false or fraudulent certifications submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### COUNT THREE
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. 3729(a)(1)(C)

101.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

102.    As set forth above, since at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly conspired to commit a violation of the False Claims Act in violation of 31 U.S.C. §3729(a)(1)(C).

103.    By virtue of said conspiracy, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus

a civil penalty for each violation.

## COUNT FOUR
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. 3729(a)(1)(G)

104.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

105.    As set forth above, since at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

106.    The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within 60 days of identification or the date of any corresponding cost report is due, and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  See 42 U.S.C. § 1320a-7k(d).

107.    By virtue of BHG's violations of 31 U.S.C. § 3729(a)(1)(G), the United States suffered actual damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT FIVE
## VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT
## D.C. CODE § 2-381.02(a)(1)

108.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

109.    As set forth above, from at least November 2020 (and upon information and belief,

as early as 2016), BHG knowingly presented or caused to be presented to the District of Columbia false or fraudulent claims for payment or approval in violation of D.C. Code. § 2-381.02(a)(1).

110.    By virtue of the false or fraudulent claims submitted or caused to be submitted by BHG, the District of Columbia suffered actual damages and therefore is entitled to multiple damages under the District of Columbia False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT SIX
### VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. CODE § 2-381.02(a)(2)

111.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

112.    As set forth above, from at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the District of Columbia in violation of D.C. Code § 2-381.02(a)(2).

113.    By virtue of the false or fraudulent claims submitted or caused to be submitted by BHG, the District of Columbia suffered actual damages and therefore is entitled to multiple damages under the District of Columbia False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT SEVEN
### VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. CODE § 2-381.02(a)(7)

114.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

115.    As set forth above, from at least November 2020 (and upon information and belief,

as early as 2016), BHG knowingly conspired with others to commit a violation of the District of Columbia False Claims Act, D.C. Code § 2-381.02(a)(7).

116.    By virtue of said conspiracy, the District of Columbia suffered actual damages and therefore is entitled to multiple damages under the District of Columbia False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT EIGHT
### VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE ANN. § 8.01-216.3(A)(1)

117.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

118.    As set forth above, from at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly presented or caused to be presented to the Commonwealth of Virginia false or fraudulent claims for payment or approval in violation of Va. Code Ann. § 8.01-216.3(A)(1).

119.    By virtue of the false or fraudulent claims submitted or caused to be submitted by BHG, the Commonwealth of Virginia suffered actual damages and therefore is entitled to multiple damages under the Virginia Fraud Against Taxpayers Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT NINE
### VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE ANN. § 8.01-216.3(A)(2)

120.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

121.    As set forth above, from at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the Commonwealth of Virginia in

violation of Va. Code Ann. § 8.01-216.3(A)(2).

122.    By virtue of the false or fraudulent claims submitted or caused to be submitted by BHG, the Commonwealth of Virginia suffered actual damages and therefore is entitled to multiple damages under the Virginia Fraud Against Taxpayers Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT TEN**
**VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**VA. CODE ANN. § 8.01-216.3(A)(3)**

123.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

124.    As set forth above, from at least November 2020 (and upon information and belief, as early as 2016), BHG knowingly conspired with others to violate the Virginia Fraud Against Taxpayers Act in violation of Va. Code Ann. § 8.01-216.3(A)(3).

125.    By virtue of said conspiracy, the Commonwealth of Virginia suffered actual damages and therefore is entitled to multiple damages under the Virginia Fraud Against Taxpayers Act, to be determined at trial, plus a civil penalty for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, the Government and Ms. Shannon demand that judgment be entered against BHG and in favor of Ms. Shannon and the Government as follows:

On Count One through Count Forty-Three under the federal False Claims Act (and amended and equivalent state statutes), for the amount of the United States' and States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state laws; all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state laws; and all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: July 31, 2024                    Respectfully submitted,

                                        */s/ Joseph M. Callow, Jr.*
                                        Joseph M. Callow, Jr. (admitted *pro hac vice*)
                                        Gregory M. Utter (admitted *pro hac vice*)
                                        CALLOW + UTTER LAW GROUP
                                        8044 Montgomery Road, Suite 170
                                        Cincinnati, Ohio 45236
                                        Phone: (513) 378-0141
                                        jcallow@callowandutter.com
                                        gmutter@callowandutter.com

                                        Joel D. Hesch (DC Bar No. 421822)
                                        THE HESCH FIRM, LLC
                                        3540 Ridgecroft Dr.
                                        Lynchburg, VA  24503
                                        Phone: (434) 229-8677
                                        joel@howtoreportfraud.com

                                        *Attorneys for Relator, Prechelle Shannon*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically on July 31, 2024, using the Court's SCM/ECF system, which will service notice of this filing on all counsel of record.

                                        */s/ Joseph M. Callow, Jr.*
                                        Joseph M. Callow, Jr.