## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| UNITED STATES *ex rel.* PRECHELLE SHANNON *et al.*, |
| Plaintiff/Relator, |
| v. |
| BHG HOLDINGS, LLC d/b/a BEHAVIORAL HEALTH GROUP, *et al.*, |
| Defendants. |

Civil Action No. 22-cv-00354 (TSC)

## <u>MEMORANDUM OPINION</u>

Plaintiff-Relator Prechelle Shannon ("Relator") filed this *qui tam* action in the United States District Court for the District of New Jersey against Defendant BHG Holdings, LLC, d/b/a Behavioral Health Group ("BHG" or "Defendant"), Behavioral Health Group, Inc.,[1] and John Doe Entities 1-50, under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729. ECF No. 1. Relator's case was transferred to this district on February 9, 2022. ECF No. 6 (SEALED). The United States declined to intervene in the action on December 18, 2023, ECF No. 14, and on July 31, 2024, Relator filed an Amended Complaint, Am. Compl., ECF No. 38. Defendant moved to

---

[1] Defendant contends that Behavioral Health Group, Inc. is "not associated in any way with BHG, and undersigned counsel has not entered an appearance on behalf of this entity." *See* Def.'s MTD at 4 n. 3. Because service does not appear to have been properly effectuated on this entity, and no appearance has been entered on behalf of it, this Memorandum Opinion applies only to the instant BHG Defendants.

dismiss Relator's Amended Complaint.  Def.'s Mot. to Dismiss ("Def.'s MTD"), ECF No. 39.  For the reasons set forth below, the court will GRANT Defendant's motion to dismiss.

## I.    BACKGROUND

As it must at the motion to dismiss stage, the court accepts Relator's allegations as true. Relator is the former Program Director and Regional Clinical Director at two Behavioral Health Group ("BHG") clinics in Washington D.C. and Virginia.  Am. Compl. ¶ 9.  BHG is a national network of outpatient opioid treatment and recovery centers, with 115 clinics across 22 states.  *Id.* ¶¶ 2, 62.  BHG has one clinic in Washington, D.C., and eight clinics in Virginia.  *Id.* ¶ 62.  Relator was hired in November 2020 but left her role after she raised concerns about fraudulent schemes to both BHG and her supervisor and was ignored.  *Id.* ¶¶ 6, 9, 64.  Relator alleges that BHG engaged in two fraudulent schemes to illegally bill Medicare and Medicaid for medically unnecessary and unlawful drug tests and services.  *Id.* ¶¶ 5, 63, 77.

### A.  The Medicare and Medicaid Program

In 1965, Congress established Medicare to provide nationalized health coverage for both older and disabled Americans.  *Id.* ¶ 26.  Medicaid is a joint federal-state program that provides payment of medical expenses for low-income and disabled patients.  *Id.* ¶¶ 41, 45.

Part A of the Medicare Act, 42 U.S.C. § 1395c, *et seq.*, provides insurance for the cost of inpatient hospital services and other services, and generally pays 100% of the cost of covered services after deductibles and co-insurance, up to Medicare coverage limits.  *Id.* ¶ 28.  Part B of the Medicare Act, 42 U.S.C. § 1395j, *et seq.*, is a voluntary program in which the beneficiary pays premiums to Medicare and in return, Medicare pays the costs of the patient's medically necessary outpatient services and generally covers 80% of the cost after deductibles.  *Id.* ¶ 29.

Medicare and Medicaid routinely cover only those tests and services that are reasonable and necessary for the treatment or diagnosis of a patient's illness or injury and performed by the physician or other Medicare-qualified clinical personnel who is treating the beneficiary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 424.10(a); Am. Compl. ¶¶ 42, 65. The need for each test for each patient must be individually assessed. *Id.* §§ 410.32(a), (d)(2); Am. Compl. ¶¶ 42, 65.

### B.  Urine Drug Tests (UDTs) at BHG's D.C. and Virginia Clinics

Urine drug tests ("UDTs") reveal the amount of a particular substance in a patient's system and are conducted to determine "whether a patient is taking drugs that might interfere with planned medical treatment, or to ensure that a patient in a recovery program is not abusing prescription or illicit drugs." Am. Compl. ¶¶ 3, 44. BHG performs UDTs on its patients—approximately 80% of whom are Medicare or Medicaid beneficiaries. *Id.* ¶ 3. Relator alleges that from 2020 through 2021, BHG used several fraudulent schemes to illegally bill Medicare and Medicaid for medically unnecessary and unlawful tests and services in both its D.C. and Virginia clinics. *Id.* ¶¶ 63, 66. Some aspects of the scheme included:

(a) Ordering unnecessary presumptive (screening) drug tests and definitive (confirmatory) drug tests for patients weekly; in many cases, ordering duplicative tests for patients more than two or three times per week;

(b) Automatically ordering and conducting unnecessary presumptive and definitive UDTs for all patients with every visit, without any physician making an individual determination that either test was medically necessary for the particular patient for whom the tests were ordered;

(c) Pressuring administrative and nursing staff to alter billing codes for increased patient drug testing, bypassing medical necessity protocols and failing to notify or obtain consent from the medical director; and

(d) Conducting unnecessary definitive drug tests, despite failing to first obtain presumptive urinalysis tests.

*Id.* ¶¶ 5, 63 (formatting modified).

For example, in its D.C. clinic, "BHG subjected clients with consistently negative urine drug test results for substances other than those prescribed medication . . . to ongoing medically

unnecessary UDTs." *Id.* ¶ 65.  Although Relator raised concerns about this to her supervisor, the practice persisted.  *Id.* ¶ 65.

Relator provides an example of the fraudulent scheme: BHG implemented a practice of designating certain patients as "Code 1" and issuing standing orders indicating the patient should receive weekly UDTs without regard to medical necessity.  *Id.* ¶ 67.  Code 1 patients would often receive duplicative tests as many as three, four, or five times per week.  *Id.*  Once a client completed an initial UDT, BHG then "used standing orders and incentive structures for BHG staff to promote the overuse of confirmatory drug tests regardless of the results of the initial screen or other clinically relevant facts."  *Id.* ¶ 68.  In other cases, Code 1 patients and other patients skipped the initial preliminary screen altogether and "instead were ordered to take medically unnecessary definitive drug tests, which would be reimbursed at a substantially higher rate by the Government." *Id.* ¶ 69.

Relator alleges that, on information and belief, with respect to the medically unnecessary UDTs, BHG's D.C. and Virginia clinics submitted 400-800 medically unnecessary UDTs per month, which amounted to thousands of false claims for medically unnecessary drug tests for thousands of patients.  *Id.* ¶ 11.

**C.  Unlicensed and Uncertified Counselors in BHG's Virginia Clinic**

Relator alleges a second fraudulent scheme: "from 2016 to 2021, and upon information and belief, continuing to the present," BHG used "unlicensed and uncertified counselors" to perform substance abuse treatment services in its eight Virginia clinic for thousands of patients, contrary to Medicare/Medicaid and Virginia requirements.  *Id.* ¶¶ 7, 63, 79, 80.

Under Virginia Code § 54-1-3506, BHG was required to use licensed counselors for substance abuse treatment services.  *Id.* ¶ 78 ("In the independent practice of substance abuse

treatment . . . it shall be necessary to hold a license issued by the Board [of Counseling.]").

*Id.* ¶ 61. Virginia's Chapter 35, articles for substance abuse counselors (§ 54.1-3507.1), and

guidance document 115-11 from the Board of Counseling, also outline the scope of practice for

those regulated by the Board. *Id.* ¶ 9. This fraudulent scheme included:

> (a) Using unlicensed and uncertified counselors to perform treatment and illegally billing Medicare/Medicaid for their services at eight of its Virginia clinics;
> (b) Forcing staff to conduct unnecessary counseling sessions, and UDTs of all Medicare/Medicaid patients on a weekly basis, regardless of medical necessity; and
> (c) Forcing / pressuring staff to enroll Virginia Medicaid patients in care coordinated services regardless of medical necessity at eight of its Virginia clinics.

*Id.* ¶¶ 63, 77 (formatting modified).

BHG also allegedly "threatened staff with violations of Medicaid care requirements,"

claiming that the staff were not meeting Medicaid standards if they failed to enroll all Medicaid

clients in care coordination. *Id.* ¶ 77. BHG leadership directed clinical management "to discipline

counselors who failed to enroll clients in these services regardless of medical necessity." *Id.*

Relator alleges that "BHG internally knew that it had a problem with unlicensed counselors

in Virginia," *id.* ¶ 81, and she attaches several email conversations between BHG employees

discussing the licensure issue. *See* Am. Compl, Ex.'s A–E. Relator "personally reported the

problem within BHG" to her immediate supervisors, Shari Garceau and Tina Beckley, and others

at BHG including, but not limited to, Amamda Karistai, Thomas Whinnett, Tammy Kinlaw, Patick

Nicholas, and Tequia Young. *Id.* ¶ 81. Relator urged BHG leadership to contact the Virginia Board

of Counseling, "but they declined to do so and continued with their scheme." *Id.* ¶ 82.

### D. Relevant Procedural Background

Relator's *qui tam* action was transferred to this district from the District of New Jersey.

ECF No. 6 (SEALED). The United States declined to intervene in the action on December 18,

2023, and on July 31, 2024, Relator filed an Amended Complaint, Am. Compl., which Defendant moves to dismiss. Def.'s MTD. Relator alleges ten causes of action: Counts I and II are brought under the false claim and false statement provisions of the federal FCA, 31 U.S.C. § 3729(a)(1)(A)-(a)(1)(B), respectively; Count III is brought under the conspiracy provision of the federal FCA, § 3729(a)(1)(c);[2] Count IV is brought under the "reverse false claims" provision of the federal FCA, § 3729(a)(1)(G); and Counts V through X are brought under analogous D.C. and Virginia false claims laws.

## II.    LEGAL STANDARD

**Rule 12(b)(6) Dismissal**

A Rule 12(b)(6) motion seeks dismissal on the grounds that the complaint fails "to state a claim upon which relief can be granted," and "tests the legal sufficiency of a complaint." Fed. R. Civ. P. 12(b)(6); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The facts alleged must allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 129–30 (D.C. Cir. 2012) (quotation marks and citation omitted). In drawing such reasonable inferences, the court must grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). "However, the court need not accept inferences . . . [that] are unsupported by the facts set out in the complaint. Nor must the court

---

[2] Relator voluntarily dismissed her conspiracy claim under 31 U.S.C. § 3729(a)(1)(C). Pl.'s Opp'n to Def.'s Mot. to Dismiss at 22 ("Pl.'s Opp'n"), ECF No. 42.

accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Generally, a court does not consider materials beyond the pleadings, but it may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]" *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119–20 (D.D.C. 2011) (internal quotation marks and citations omitted).

## III.    ANALYSIS

### A.  The Public Disclosure Bar Does Not Apply

Defendant first argues that the court should dismiss the allegations related to the medically unnecessary UDTs under the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4) because those allegations are the same as industry-wide allegations that were publicly disclosed in an earlier *qui tam* action—*United States ex rel. Ashton et al. v. Logan Laboratories, LLC et al.*, No. 16-CV-4583-EGS (E.D. Pa., filed August 22, 2016)—and a related press release from the U.S. Department of Justice ("DOJ") announcing a settlement in that case.  *See* Def.'s MTD at 33.  Defendant further argues that Relator cannot overcome the bar because she is not an original source.  *See id.* at 40–42.

The FCA contains a public disclosure bar that limits a party's ability to bring a *qui tam* suit where the fraud is already publicly known.  *U.S. ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 39 (D.C. Cir. 2014).  Under the public disclosure bar, FCA actions alleging "substantially the same allegations or transactions . . . [that] were publicly disclosed . . . in a Federal [civil] hearing in which the Government or its agent is a party . . . or from the news media" shall be dismissed,

unless the "person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A); *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994).

In its "foundational" formulation of the inquiry to determine whether the public disclosure bar applies, the D.C. Circuit characterized the quest algebraically.  *See id.*  If an allegation of fraud (Z) requires both a misrepresented state of facts (X) and a true state of facts (Y), such that X + Y = Z, then the public disclosure bar applies if both X and Y are in the public domain and would alert the government to "the likelihood of wrongdoing."  *Id.* (citation omitted); *see U.S. ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 933 (D.C. Cir. 2017).

The court begins by recasting Relator's allegations using the *Springfield Terminal* formulation.  Applied to these facts, the formulation would be that (X) BHG ordered medically unnecessary UDTs, (Y) plus the fact that BHG knowingly and falsely certified that its claims for reimbursement of those tests complied with all applicable laws and regulations, (Z) gives rise to the conclusion that BHG committed fraud.  If either X and Y, or Z was in the public domain before the Relator brought this action, then her claims cannot proceed under the public disclosure bar. *See Shea*, 863 F.3d at 933 ("If the allegation of fraud (Z) is not itself in the public domain, then the bar applies only if both X and Y are publicly known.").

A suit is "based upon publicly disclosed allegations or transactions" when the allegations in the complaint are "substantially similar to those in the public domain."  *U.S. ex rel. Davis v. D.C.*, 679 F.3d 832, 836 (D.C. Cir. 2012) (quoting *U.S. ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997) (internal quotations marks omitted).  Defendant argues that the *Logan Laboratories* complaint is a public disclosure because it a federal civil case in which the Government was a party, and the DOJ press release is a public disclosure because it is "news

media."  Def.'s MTD at 32, 35–6.  Defendant next argues that Relator's allegations are substantially the same as those found in the *Logan Laboratories* complaint and the DOJ press release "because the allegations are copied verbatim."  *Id.* at 33.  To illustrate this point, Defendant provides a side-by-side chart comparing the allegations in the *Logan Laboratories* complaint and the allegations in this suit, arguing that "[a]ll Relator has done is substitute a different named defendant into an already publicly disclosed complaint with industry-wide allegations well known to the Government and industry participants like BHG, which are easily identifiable."  Def.'s MTD at 29–33.

The court finds that Relator's allegations were not in the public domain because none of the BHG-specific information in her Amended Complaint had been publicly disclosed. Consequently, the court does not reach the question of whether Relator was an original source. *See Springfield Terminal*, 14 F.3d at 651 (discussing how court will proceed to original source inquiry "if—and only if—" the court finds that allegations upon which suit is based had been publicly disclosed).

To begin, although some of the language in Relator's Amended Complaint does appear to be similar—if not at times verbatim—to the language in the *Logan Laboratories* complaint, that suit was not against BHG but an entirely different entity.  The *Logan Laboratories* complaint thus would not have "alerted law-enforcement authorities to the likelihood of wrongdoing" on BHG's part, and nothing suggests that the "the government already ha[d] enough information to investigate the case and to make a decision whether to prosecute" BHG.  *See Davis*, 679 F.3d at 836 (quoting *Springfield Terminal*, 14 F.3d at 654).

Defendant cites *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) for the proposition that "a relator's ability to reveal specific instances of fraud

where the general practice has already been publicly disclosed is insufficient" to overcome the bar. Def.'s MTD at 40.  But this case, against a different defendant, is unlike *Settlemire*, where the same district officials had publicly disclosed that they were doing what the relator alleged—that they were indeed using "Expansion Act money for purposes other than those required by that Act."  *See Settlemire*, 198 F.3d at 918–19; *see also United States v. Lozano*, No. CV 17-2433 (RJL), 2023 WL 6065161, at *3 (D.D.C. Sept. 18, 2023) (finding public disclosure bar applied where a prior *qui tam* suit was filed against the same defendant).

Although Defendant argues that Relator's allegations "are neither independent of nor add anything material to the already well publicized allegations applicable to any participant in the substance abuse or behavioral health industry," Def.'s MTD at 27, this case is not about "any" participant in the industry—it is against BHG and does not allege widespread behavior by other treatment providers.  Defendant essentially claims immunity from any similar suit because this fraudulent scheme seems to run "industry wide."  *See id.*  Importantly, Defendant does not allege that anyone publicly disclosed that BHG was engaging in the fraudulent conduct at issue—only that other plaintiffs have alleged that other companies were engaging in similar fraudulent conduct. Thus, for the first time, the Amended Complaint names Defendant as being involved in fraudulent activity violating the FCA.  Taking Relator's allegations as true, the court finds that her allegations against Defendant were not publicly disclosed.

Defendant is correct that BHG need not be named in the public disclosures to trigger the bar.  Def's Mot. at 33.  But this case is distinguishable from those upon which Defendant relies. For example, in *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*—a *qui tam* action against an unnamed health facility—the court found that the public disclosure bar applied, where the disclosure came from a *New York Times* article discussing health facilities within the

same network as the unnamed health facilities.  498 F. Supp. 2d 25, 48 (D.D.C. 2007).  The article described how "certain specific Columbia [Health] facilities had engaged in certain specific techniques for defrauding Medicare" and "that many other facilities, *not named therein*, had engaged in similar fraudulent practices."  *Id.* (emphasis added).  Thus, because the relator's allegations were based on the article's disclosure that Medicare fraud occurred across an entire, specific healthcare network—including "unnamed facilities"—the court found that the public disclosure bar applied.  Here, BHG does not suggest that there was information in the public domain about any of its other clinics (either through a prior lawsuit or otherwise) or about BHG's business practices.  *See U.S. ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 234–35 (D.D.C. 2006) (finding court did not have jurisdiction over *qui tam* suit because media reports documenting size and scope of defendants' businesses were in public domain long before plaintiff sued.)

At bottom, Defendant asks this court to find that if one lab testing company is sued under the FCA for ordering and submitting false tests, other lab testing companies around the country engaging in similar conduct should be protected from liability under the public disclosure bar.  The fact that there have been public are industry-wide allegations is not enough to bar Relator's suit.

**B. Relator Fails to State a Claim as to the Fraudulent Schemes**

Though the public disclosure bar does not apply, Relator's claims fail the plausibility and particularity requirement under Federal Rule of Civil Procedure 8(a) and 9(b).  For the reasons explained below, the court will dismiss her claims.

**a. Fed. R. Civ. P. 8(a) & (9)(b)**

Federal Rule of Civil Procedure 8(a) provides that a pleading "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Because the FCA is an

"anti-fraud statute, complaints brought under it must [also] comply with Rule 9(b)." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *Kowal*, 16 F.3d at 1278). Courts have characterized a plaintiff's burden as providing "the who, what, when, and where with respect to the circumstances of the fraud." *United States ex rel. Brady Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 68 (D.D.C. 2018) (cleaned up). While the court must take as true all allegations of material fact and construe them in the light most favorable to the pleader, the pleader still must satisfy her burden by stating with particularity the supporting factual allegations for her claim. *Kowal,* 16 F.3d at 1278.

i.    **Counts I and II – False Claims Presentment Provision, FCA § 3729(a)(1)(A) & False Statement Provision, FCA § 3729(a)(1)(B)**

The first two counts of the Amended Complaint are for presentment of false or fraudulent claims for payment under 31 U.S.C. § 3729(a)(1)(A) (Count I), and knowing use of false records and statements to get false claims paid or approved under 31 U.S.C. § 3729(a)(1)(B) (Count II).

FCA section 3729(a)(1)(A) establishes liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To satisfy a "presentment" claim, a plaintiff must allege facts plausibly showing that the defendant submitted "'[1] a claim to the government, [2] that the claim was false, and [3] that the defendant knew that the claim was false.'" *U.S. ex rel. Davis v. D.C.*, 793 F.3d 120, 124 (D.C. Cir. 2015) (quoting *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.,* 318 F.3d 214, 218 (D.C. Cir. 2003).

FCA's false statement provision, section 3729(a)(1)(B), requires that a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement, material to a false or fraudulent claim." 31 U.S.C. § 3729 (a)(1)(B). Subsection (a)(1)(B) is "designed to prevent those who make false records or statements [in order] to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.,* 380 F.3d 488, 501 (D.C. Cir. 2004) (emphasis in original). The difference between the sections is that § 3729(a)(1)(B) requires evidence that the defendant made a false *statement* to the government, rather than *submitting* a false claim for payment. *Compare* 31 U.S.C. § 3729(a)(1)(B) *with id.* § 3729(a)(1)(A).

a.   **UDTs Scheme**

Relator alleges that BHG ordered medically unnecessary UDTs, then submitted false claims for reimbursement to the Government, by which BHG made false statements to the Government when it certified that the claims complied with Medicare/Medicaid regulations, all while knowing that the claims were false. Am Compl. ¶¶ 11, 21. Defendant first argues, in part, that Relator offers no specific factual allegations regarding how or why the BHG tests were medically unnecessary to ultimately consider these "false" claims. *See* Def.'s MTD at 10–16. The court agrees that Relator's allegations as to the UDTs scheme do not meet the requirements of Rule 9(b).

To begin, Relator claims that part of Defendant's scheme included "ordering unnecessary screening drug tests and confirmatory drug tests for patients weekly" and "ordering duplicative tests for patients more than two or three times per week." Am. Compl. ¶ 5 (cleaned up). But she does not plead facts or give examples indicating why the tests were medically unnecessary. *See United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-CV-392 (TSC), 2019 WL 13132849, at

*2 (D.D.C. Mar. 25, 2019) (dismissing complaint, in part, under rule (9)(b) because complaint did not describe any factual support for inference that relevant procedure was not medically necessary, nor did complain explain how medical necessity should be assessed).

Relator alleges that BHG would automatically order and conduct unnecessary drug tests "without any physician making an individual determination that either test was medically necessary for that particular patient." Am. Compl. ¶ 5. But under the relevant regulations she cites, other Medicare-qualified clinical personnel—not only physicians—are permitted to certify that tests are medically necessary. *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 424.10(a). Under the regulations, for example, other qualified clinical personnel can "furnish services that would be physician services if furnished by a physician" and "may be treated the same as physicians treating beneficiaries for the purpose of this paragraph," subject to certain conditions. *See* 42 C.F.R. § 410.32(a)(2). Without facts indicating what made these tests medically unnecessary, Plaintiff fails to demonstrate falsity, an essential element to her claim.

In *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, the court found that the relator (the medical director for a health insurance company) had pleaded sufficient facts to support her claim that the tests were ordered for medically unnecessary purposes. 255 F. Supp. 3d 13, 19 (D.D.C.), *amended on reconsideration in part*, 296 F. Supp. 3d 155 (D.D.C. 2017). The court cited a few reasons. First, the allegations that Defendant billed for unnecessary tests were based on the relator and her team's examination of the company's data regarding tests that were ordered for patients who had government health insurance. *Id.* While director, the relator examined an entire years' worth of data of claims that Defendant had submitted to the insurer, identified a combination of seven tests that were frequently performed and billed by Defendant, and "specifically compared [Defendant's] billing of that combination to other laboratories." *Id.* The comparison revealed that

Defendant was "an extreme outlier in the frequency of billing this combination of seven tests" that was billed to the insurance company. *Id.* Second, the relator supported her allegations that the tests were medically unnecessary by citing to scientific authority, including a guideline jointly published by the American Heart Association and the American College of Cardiology. *Id.* at 19, 25. Third, the relator provided an example of a specific claim the Defendant submitted to the health insurance company. *Id.* at 19. Finally, as here, the relator cited to the Medicare statute and regulations and local coverage determinations. But unlike that case, Relator pleads some relevant facts but not enough to satisfy Rule 9(b)'s particularity requirement.

Relator suggests that ordering confirmatory UDTs without obtaining initial screening "is medically appropriate only in limited circumstances[] and is not medically necessary." Am. Compl. ¶ 65. But again, she provides no support for that allegation, aside from citing to the Medicare statute. This is not enough, especially when Relator also claims that a UDT is "recognized as an appropriate medical treatment and is often reimbursed by public and private insurers for this purpose," and "individuals with substance use disorders receive UDTs on a regular basis, and many of these patients' testing is covered by Medicare." *Id.* ¶¶ 44, 54. She also alleges that running "confirmatory drug tests for all or most patients is medically unnecessary, fraudulent, and not economical." *Id.* ¶ 53. First, she does not allege that BHG was ordering confirmatory drug tests for *all* or *most* of its patients. And second, the support she cites to suggests that there are scenarios in which patients could receive "routine multi-drug confirmatory testing" or "routine confirmatory drug tests with negative presumptive results." *See id.* ¶ 53 n. 4. Relator has not sufficiently pleaded why the UDTs at issue were not medically appropriate or necessary.

For support, Relator cites to "Code 1" patients, who she claims often received "duplicative tests" each week "without regard to medical necessity." *Id.* ¶¶ 67–68. Once a patient received an

initial test, "BHG then used standing orders and incentive structures for BHG staff to promote the overuse of confirmatory drug tests regardless of the results of the initial screen or other clinically relevant facts." *Id.* ¶ 68.  She alleges that "[i]n other cases, Code 1 patients—as well as others— simply skipped the initial preliminary screen altogether and instead were ordered to take medically unnecessary definitive drug tests, which would be reimbursed at a substantially higher rate by the Government." *Id.* ¶ 69.  But again, Relator does not allege why these tests were medically unnecessary, why duplicative tests are per se unreasonable or unnecessary, who was ordering these tests and making these determinations, or that these patients were Medicare/Medicaid patients. According to Relator's Amended Complaint, standing orders are not presumptively fraudulent or unreasonable.  *See id.* ¶ 59.  She cites to the Office of the Inspector General's Compliance Program Guidance for Clinical Laboratories 63 FR 45076, which suggests standing orders "have led to abusive practices," but also states that when standing orders are in place, testing facilities have a duty to monitor them to ensure that tests are reasonable and necessary.  *Id.* n. 5.

As the D.C. Circuit has stated, "Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when the scheme spans several years, [but] defendants must be able to 'defend against the charge and not just deny that they have done anything wrong.'" *Williams,* 389 F.3d at 1259 (quoting *United States ex rel. Lee v. SmithKline Beecham, Inc.,* 245 F.3d 1048, 1052 (9th Cir.2001)).  Given the Complaint's vague allegations of false claims and false statements, BHG is not afforded the ability to "defend against the charge" but is forced to offer a blanket denial "that [it has] done anything wrong."  *Id.*  Accordingly, Counts I and II of the Complaint as to the UDTs scheme will be dismissed.

###### b. Counselor Services at BHG

For both sections of the FCA—§ 3729(a)(1)(A) and § 3729(a)(1)(B)—courts have read into the element of falsity a materiality component. *See, e.g.*, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269, 1270–71 (D.C. Cir. 2010) (discussing all three elements). Thus, an FCA claim requires falsity, materiality, and scienter. *Id.; United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 98–99 (D.D.C. 2017).

Defendant argues that the Amended Complaint's allegations "are even sparser as to counseling services, as it pleads no facts as to scope and/or type of services that counselors provided to patients at BHG treatment centers and how they were ultimately submitted for reimbursement and to which payors." Def's MTD at 11. As to materiality, Defendant contends that Relator "fails to allege what representations were made to any government payor regarding the licensure and/or credentialing of counselors with regard to any claims for services." *Id.* at 26. While Relator's allegation as to the unlicensed counselor scheme satisfies Rule 9(b)'s particularity requirement, Relator fails to allege falsity and materiality. Therefore, the court will dismiss Counts I and II of the Amended Complaint as to the counselor services scheme.

Relator's allegations are pled with particularity. She claims that from 2016 to the present, BHG used unlicensed and uncertified counselors to "illegally bill[] Medicare/Medicaid for their services at eight of its Virginia clinics," Am Compl. ¶ 77, and that "BHG was required under Virginia rules to use licensed counselors for substance abuse treatment services." *Id.* ¶ 78; Va. Code § 54-1-3506. She alleges that "BHG internally knew that it had a problem with unlicensed counselors in Virginia" and supports this contention with several email conversations discussing the licensure issue. *Id.* ¶ 81; *see id.*, Ex.'s A–E. She also claims that she "personally reported the problem within BHG" to her immediate supervisors and others at BHG. *Id.* ¶ 81. Consequently,

Relator sufficiently alleges the "who, what, when, and where" of the alleged fraudulent scheme. *Comstor*, 308 F. Supp. 3d at 68.

But on a closer look, Relator's allegations fail to meet the falsity and materiality elements. As to falsity, a claim is legally false "when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Sci. Applications Int'l Corp.*, 626 F.3d at 1266. Here, Relator does not sufficiently plead facts to show that Defendant's claims were false.

Relator alleges that licensure was a requirement and that reimbursement from Medicare or Medicaid depended on the BHG's counselors being licensed. Am. Compl. ¶ 79. But the relevant Virginia statute contradicts this. Under the statute, licensure is a requirement, but there are exceptions allowing for the use of unlicensed counselors. For example, the statute expressly provides that counselors who are not licensed substance abuse treatment practitioners may provide services if they do so while under supervision. Va. Code § 54.1-3506. The statute governing the licensing of counselors states:

> Any person who renders substance abuse treatment services as defined in this chapter and who is not licensed to do so, ***other than a person who is exempt pursuant to § 54.1-3501***, shall render such services only when he is (i) under the supervision and direction of a person licensed under this chapter who shall be responsible for the services performed by such unlicensed person, or (ii) in compliance with the regulations governing an organization or a facility licensed by the Department of Behavioral Health and Developmental Services….

Va. Code § 54.1-3506 (emphasis added).

Moreover, even if Relator had pled falsity, her allegations still fail under the FCA's materiality requirement. To state a claim under the FCA, Relator must allege that the false claim was "material to the government's decision to make the payment at issue." *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 86 (D.D.C. 2014) (citing *United States ex rel. Head v. Kane Co.*,

798 F. Supp. 2d 186, 194 (D.D.C. 2011)).  "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181 (2016).

Relator claims that materiality is "a matter of common sense" and "is inferred from the claims themselves."  Pl.'s Opp'n at 16–17.  She claims that "licensure was material to the Government's payment of claims for substance abuse treatment services" and that "BHG cannot dispute that the Government pays for . . . substance abuse treatment services performed by unlicensed counselors – when licensure is at the heart of the Virginia regulation."  *Id.*  For the same reasons already discussed, the court is unpersuaded by Relator's argument that licensure was material to the Government's payment because licensure is required for reimbursement.

In her opposition, Relator simply restates her allegation that the "fraud was material to payment by the Government" and had "the Government known that the services billed were . . . being performed by an unlicensed counselor, it would not have paid BHG[.]"  *Id.* ¶ 94.  This is not enough.  Relator does not plead how the misrepresentation was "material to the [Government's] course of action" and "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment."  *Escobar*, 579 U.S. at 191; *cf. Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 39 (2011) (materiality cannot rest on "a single fact or occurrence as always determinative" (internal quotation marks omitted)).

Moreover, a false statement is only material if the government "would not have honored the submission for payment on the claim if it were aware of the violation." *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Grp., Inc.*, 370 F. Supp. 2d 18, 45 (D.D.C. 2005).  It is insufficient "that the Government would have the option to decline to pay if it knew of the

defendant's noncompliance." *Escobar*, 579 U.S. at 194.  Thus, a relator must show that the government "consistently refuses to pay claims . . . based on noncompliance with the particular . . . requirement." *Id.* at 195.  Relator has not done so.

For all the reasons discussed, Relator fails to plead materiality as to the false submissions and false statements allegedly made under § 3729(a)(1)(A) and § 3729(a)(1)(B) as to the unlicensed counselor scheme.  Consequently, her claims regarding the unlicensed counselor scheme will be dismissed.

### ii.    Count Four – FCA Reverse False Claims Provision, 31 U.S.C. § 3729(a)(1)(G)

Defendant argues that Relator's "reverse" FCA (a)(1)(G) claims fail as a matter of law because Relator fails to plead any elements unique to either claim.

Section 3729(a)(1)(G) of the FCA, known as the "reverse false claims" provision, creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  Thus, "a typical reverse false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due."  *United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82 (D.D.C. 2018) (quoting *Pencheng Si.*, 71 F. Supp. at 88).

Relator claims that "the Affordable Care Act requires a person who has received an overpayment [of Medicare or Medicaid] to report and return the overpayment within 60 days of identification or the date of any corresponding cost report is due[,] and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C.

§ 3729(a)(1)(G)." Am. Compl. ¶ 23.  She also alleges that "[b]y virtue of BHG's violations of 31 U.S.C. § 3729(a)(1)(G), the United States suffered actual damages and is therefore entitled to treble damages under the False Claims Act[.]"  *Id.* ¶ 107.

Relator has alleged no facts suggesting BHG owed any payments to the government, that payment was obligated, or that BHG avoided making payments when payment was due.  Because Relator has not alleged the necessary elements under § 3729(a)(1)(G), Count 4 will be dismissed.

### C.  Relator's State Law Claims Fail

Finally, the court will dismiss the Amended Complaint's claims under analogous D.C. and Virginia state False Claims Act laws because the Amended Complaint does not allege sufficient details on these claims.  In her opposition, Relator addresses her state claims in one sentence: "[Plaintiff] has properly pled her federal FCA claims, and it naturally follows that she has adequately pled her related state law claims as well. BHG's motion to dismiss on this argument should be denied." Pl.'s Opp'n at 23.  Relator does not allege how Medicaid reimbursement works under either D.C. or Virginia law.  Nor does she present any details specific to any of those particular statutes independent of the arguments on the federal claims.  For these reasons, her state law claims will be dismissed.

## IV.    CONCLUSION

For these reasons, the court will GRANT Defendant's Motions to Dismiss, ECF No. 39.  A corresponding order will accompany this Memorandum Opinion.


Date: March 31, 2025

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge